The next matter is Webb v. City of Philadelphia. Mr. Pollack? Yes, Your Honor. How are you this morning? Good morning. Shall I proceed, Judge? Yes, whenever you're ready. Good morning, Your Honors. My name is Jeff Pollack. I'm a partner with Fox Rothschild and with my co-counsel, Professor Saval Yildrim of Whittier Law School. We represent, on appeal, Officer Kim Webb. Before I proceed to the oral argument, substantive, I'd like to thank Deckert and particularly John Gose for their excellent work on behalf of the ACLU. This case represents, in our view, a rare opportunity. It is perhaps the first brief in the United States in which Muslim, Sikh, and Jewish organizations have each supported the same cause, because in large part, this case isn't just about Kim Webb. It's about the Jew who wants to wear a yarmulke. It's about the Sikh who wants to wear a turban. It's about the Muslim who wants to wear a headscarf. It's about the Christian who wants to wear a cross. With that introduction in mind and with a view toward trying to focus here, am I correct, then, that the only claim before us is the Title VII religious discrimination matter and that the three constitutional claims were not raised before the District Court, so they can't properly be before us, and with respect to the gender discrimination claim, it just was not exhausted? I would respectfully disagree, Your Honor. The reason being is that at the very beginning of this matter, Kim Webb filed her very first complaint with the city police department, and in, on page 93, the last sentence of that paragraph, this is Appendices Volume 2, page 93, she specifically stated in her initial request for religious accommodation that she expressed the reason she wanted to wear the headscarf was based upon the First Amendment of the United States Constitution. Although it is true it was not properly pled before the United States District Court below, counsel for Kim Webb at that time, and I was not counsel at that time, did plead the fact that she was asserting, among other things, her constitutional rights. She did not state specifically which one, Judge Smith, you're correct on that. However, the city of Philadelphia responded and did not ever seek clarification. So, respectfully, I would state that she did assert the issue. Did she seek it perfectly? No. Moreover, at the trial court... Is there a burden on the defendant to seek clarification in a situation like this? I think it was, properly, Judge, it was Judge Webb's responsibility to assert that issue more carefully. But, at the trial court below, it was the city of Philadelphia's counsel, which are the ones that introduced Kelly and Johnson and the city of Northcase into the discussion. They are the ones who introduced the very issue of the First Amendment. Judge, the district court below, specifically, is the one who relied upon those cases and the city of Northcase, all First Amendment cases, in responding to Officer Webb's claim. From fundamental due process, if the city of Philadelphia can argue it, if the district court can rely upon it, I've got to be able to respond to it. But, Judge Smith, in fairness to you and to your question, you are correct. It was not properly raised below. I was going to address, therefore, first those issues under Rule 56C that would warrant a remand and reconsideration based upon what we believe are fatal defects in the current record. Judge Smith also asked you about the sex discrimination case. And, as I understand your complaint, you're arguing that, if I can use the term fair presentation, would borrow that language from the habeas jurisprudence. You're arguing, I think, that the sexual discrimination claim was fairly presented before the EEOC. And, therefore, that's so in the case. Is that right? Actually, slightly differently, Judge McKee. What I'm arguing is this. Kim Webb did mess up. She checked off only the issue, the box for religious discrimination. But, with the district court below... It wasn't just a matter of checking it off. Then, in the following section, where she can textually set out in greater specifics a claim, there's nothing mentioned there that evokes a gender discrimination. I disagree, respectfully, Judge. The reason being... In response to what she said, and I don't want to get too sidetracked on this, because there's some pretty weighty issues in terms of what is clearly before us. But, she talked about how they hired me, my religion is Islam. She wanted a reasonable accommodation of wearing the Khmer Muslim hood cuff ring. Sergeant Thomas Christian denied the request. They didn't mention whether it was safety. I requested a writing permission to wear my Khmer, one paragraph, paragraph two. I believe the respondent discriminated me because of my religion, I'm a Muslim, in violation of Title VII. The Civil Rights Act of 1964 is amended. You wouldn't even have to be clairvoyant to get sex discrimination. It's just not there. It's not the box. I understand that that might be hyper-technical. Someone checked the box as the one claim, and then, in the text of the claim, laid out a factual scenario, which clearly put the tribunal on notice that this person is alleging a lot more than just what is checked off in that box. There may be an issue about whether or not there's waiver, but here there's nothing to suggest a sex discrimination claim. You might be right on the First Amendment issue. I'm not really sure, but you may be, because she talks about right of religion there. But, as to sex discrimination, I just can't find it. Your Honor, I respectfully disagree for one simple reason, and you mentioned the key word, headscarf. In Islam, only a woman wears a headscarf. It is a claim uniquely and solely to a woman. If you're right about that, the discriminatory act would not be because of the headscarf. It would be because of the religious discrimination, the same as in the city of Newark. The police officers there weren't concerned because, as men, they wanted to assert their masculinity and wear beards. The claim was that because their religion required them to wear beards if they could, they were being denied a basic tenet of their religious practice by the police force, which allowed for, then, a non-religious exception for medicine. And, therefore, there's a religious discrimination. But that's not here. Your Honor, in this regard, the Third Circuit precedent, and I'm sure you've dealt with more Title VII claims than I have, is one, there's two prongs to the investigation. One, was it reasonably within the scope of the original complaint? And, arguably, it may not have been. But it was, the fact is that she mentioned hijab. Only a headscarf is worn by a woman in Islam. Second of all, the question is, what a reasonable investigation of that claim. And what was the claim she made? The only claim she made was, I was denied the right to serve my city and to wear my headscarf to serve God at the same time. That investigation inherently would have led to the issue of whether the headscarf was a religious claim as well as a sex-based claim because, exactly the city of Newark case, the city of Newark case made an accommodation for men because under the ADA, a secular accommodation had been made for others. And since we can't discriminate for or against religion, an accommodation was made for Muslim men to wear beards. By the same coin, one factual question here that begs investigation is, where is the accommodation for a woman? And in this case, the woman, the accommodations she's seeking, which I believe logically would have, inherently would have had to flow out of the investigation, is that this is a claim only a woman could make. Good. We understand your position. We have a very important issue here. Why don't you go ahead and address it? Yes, Your Honor. The first issue I'd like to address as far as factual disputes is the lack of a hardship, undue hardship under Title VII. In this regard, the requirement is that there must be more than mere conjecture. At this point, we have ample evidence, and there was some evidence in the record already that the City of New York had allowed others, Sikhs, for example, to wear turbans. We now know from other examples that Washington, D.C., New York, and other cities throughout the country, Los Angeles, have allowed others to wear headscarves, hijabs, Sikhs wear turbans, Jews wear yarmulkes. In this case, there was no proffer whatsoever. The sole offer at one point was that Commissioner Johnson said, I talked to a lawyer and asked him, does anybody allow this? And the answer was no. And that answer was wrong. At a minimum, where the question is undue hardship, the fact is, Kim Webb, in light of the weight of her liberty rights, is entitled to more than mere conjecture that there might have been a problem. Given the weight of evidence that other cities can and have allowed exactly the recognition of the kind of liberty rights she's seeking, I respectfully believe that the proper result would be to reverse the remand and find out, is there more than mere conjecture? Is there a reason why 120 miles away in Washington, D.C., Chief Ramsey at that point reached out to the Sikh community and allowed Sikhs to wear turbans? Is there a reason why we can allow Sikhs to wear turbans in New York City but not here? There may be. Does the answer to that depend on how we define undue hardship and the level of deference we give to a paramilitary organization? I think that that may well be. And that gets to, I guess, one core question, Judge. I may be jumping ahead. Obviously, the question is, what role does the police commissioner have? And clearly we recognize as an administrative agency he gets abusive discretion on almost every issue but not on a fundamental liberty right. And certainly when you put into the balance of scales of justice the claims that Kim has raised and the interest that she has, I respectfully believe we're entitled to more than, I think it might be a problem, but I can't tell you why. Why is it the case, for example, that it is not a problem? That's not really a fair characterization of his deposition testimony, though, is it? He did say why he believed in any event it was a problem, and he described specifically the role of police officers in the community. He testified directly that he did not have any concern regarding the safety of police officers as a result of Kim's wearing the headscarf. He testified because Kim wears what's called a breakaway hijab. It comes off with Velcro or a snap. There was no testimony about it. He himself said he didn't have any problem with it. Didn't he testify to the need for members of the police department, as members of a paramilitary organization, to represent and reflect the neutrality out there in the community? That was clearly an issue raised. It was the subject of testimony. It was the subject of testimony, and there was an expert report. I beg you to look at it. It doesn't draw any conclusions. There was no opinion whatsoever in the expert report. There is nothing whatsoever than Commissioner Johnson saying it's so. And if it were the question of what color uniform should the police officers wear, what shifts they should have, what hours they should service, all probably within the administrative role that he plays as commissioner. But here we're dealing with a fundamental liberty right, and I recommend strongly that at this point his right to say, I simply think it's so, requires more proof than was proffered here. What would he have to do? What should the city do? Should they survey other departments and find out what incidents or what problems they've had as a result of different policies? What should they do in your opinion? Your Honor, there is case law, and I can't give you the exact site right now, that says he doesn't have to wait for something to fail in order to say it doesn't work. But there are things he could have done. He could have reached out to an anthropologist, a sociologist. He could have reached out to a psychologist. He could have offered some quantum of proof. Clearly the U.S. military, in response to Goldman, had a very hearty debate on exactly this issue. Should Simpson Goldman have the right to wear a yarmulke in the Air Force? The Air Force says no. Congress has a significant debate over exactly this question. What will happen? Will the military fail as a result of this issue? And they ultimately have not failed. I don't think there's been any news reports, I know of, that suddenly New York or Chicago or Washington, D.C., the police departments are falling apart. There are things the city can do. Comparing the role, however, of soldiers in a military organization and the role of police officers in a paramilitary organization is a far from perfect comparison or analogy, isn't it? I'm a far from perfect guy. You're looking at a far from perfect panel, at least at this end. Your Honor, you're at the perfect panel. I think the answer may be that that's a legitimate question. I respect it. Let's test it. Police officers are police officers. They're totally different. They really are very different. But to me, the answer is why shouldn't we test that proposition? Why? Not because a police commissioner says it so. Does that make it so? No, but that doesn't really respond. If the analogy is to look at the cases where the Yarmulke was involved and what has happened in the military context and to try to draw some lesson from that, that the commissioner's testimony here is really not based upon anything other than his own opinion, which is not substantiated by anything, I think what Judge Smith is getting at, you really are talking about apples and oranges because there's a very different mix of military and civilians and the one hand vis-a-vis police and civilians, what the military is allowed to do, what police are allowed to do. It is in two very, very different universes. Put on ten minutes, please. It may well be that the military is a different scenario. They go to Iraq. The Philadelphia police officers don't. But when you look at other major cities, the City of New York, Washington, D.C., Chicago, Los Angeles, Yuba County, California, Gwinnett County, Georgia, how can it be that they are so vastly different? Well, that's why I asked what should the city do. Should they contact these other departments? But what are you arguing they should have done before they can lay the kind of foundation that you're saying they would have to lay in order to support Policy 78? I think that what they should have done at that point was done more to go to one lawyer and say, Hey, what do you think? And the answer was, I don't think anybody does this. The answer was wrong. If the answer is that what the ACLU and we are arguing is correct, isn't the proper result, remand the matter back down to the district court. And if, in fact, the city can prove for some reason that the City of Philadelphia, which I believe, by the way, can quite easily tolerate anything that New York or Washington, D.C. or Chicago tolerates the way of civil rights. If the answer is Philadelphia somehow is bereft of the ability to handle those civil rights of the police officers, let's see the proofs. And then perhaps Kim Webb will fail. Perhaps she will succeed. Excuse me. You've indicated somehow unable to handle the civil rights of these police officers. But the fact of the matter is that the experiences of the other cities and countries that are referenced in the amicus. Yes, Your Honor. None of those are a result of any decision by a court. But rather they're the policy decisions made by a police department or by a municipality. Isn't that correct? I believe that. In fact, is there any reported decision, any precedential decision of any court of appeals that is consistent with the position you're taking? Well, the Third Circuit has allowed in the City of Newark case Muslim men to wear beards. And also the District of Utah, I believe it was Nevada, just recently ruled the same. Yeah, but in Newark, the police department itself allowed police officers to wear beards. That's true. In the District of Nevada or Utah, I don't have the case in front of me. It was just a recent ruling that came down a few weeks ago. They actually did specifically find it was not a court of appeals, Judge Smith. Should I proceed quickly or briefly, Your Honor? Oh, no, yeah, you can proceed. There was one other fundamental issue here. It sounds as if we're having some trouble with this. I just want to say my welcome before the Third Circuit, Judge. You're not doing that. We're going to take some extra time in this case. Kick me off when you're ready. No, no, no. Another fundamental… No, but let's maybe… I'm sorry, Judge. Maybe you're going to address this. From the questions you've heard so far, it seems that a key issue is this amount of deference that we owe to the police commission. The Supreme Court has talked about this for a couple of decades now. The fact is that court decisions, at least in the past, have given a great deal of deference, whether those decisions are right or wrong. They've granted that deference. Tell us why we should not be giving. Kelly v. Johnson is probably the place to start, Your Honor. A 1976 decision, I'm sorry. And in that case, the core question in Suffolk County, New York, and you may already be aware of this case, obviously, is that the question there was, could the guy have longer hair than the police regulations allow? That resulted in a 5-4 decision, I believe, split by the Supreme Court. That was 32 years ago, and it wasn't a core liberty right. Justice Rehnquist, writing the decision, I believe he was not Chief Justice at the time, noted that he said it was not a, quote-unquote, liberty right, i.e., hey, it's a haircut. Kim is asserting something very different. We have become a multicultural society. We have clearly evolved way beyond where we were 32 years ago. Goldman is proof of that, issued 10 years later in 1986. And although the district court correctly cites the case, no one noted, by the way, the congressional reaction. The point simply is that 32 years ago, it may have been right. We're 32 years later. We are a different society and a different people. You would not have seen a Sikh officer in New York City Police Department 32 years ago, I don't think. Now you do. And the fact is that at some point, while it's true, that the commissioner obviously must have the ability for him or her to function and to control the police department and perform effectively. And we have all the respect for that responsibility within their administrative role. There is a point at which, when there's a fundamental constitutional liberty right, we are entitled to more than, hey, I think it's a problem. We're entitled to some profit of proof. So your position is that the Supreme Court would look at this matter differently than they have in the past. I believe that that may well be true. When you look at Goldman and the response, which the Supreme Court has recognized at Goldman, which Congress in essence said, hey, we should not force an officer to choose. I'm sorry, Judge. No, no, but that's a congressional reaction, as you say. That's a legislative decision. Yes, but then the Supreme Court recognized that and said, yep, that's what they did and we're not going to argue with it. Sure. I'm sorry, Judge. Again, deference. Deference either to the executive on the one hand or deference to the legislative branch on the other. I suppose that's right, Your Honor. With regard to religious symbols, there was testimony below and the district court below dismissed the religious symbols, the acknowledgement of Christian symbols, on the basis the record was inadequate. I respectfully submit that this was a second fundamental error by the trial court. If we would, I'd like to look directly at what Officer Belal testified to, and here I refer to Appendix A2, Paragraph 17. Officer Belal said and testified under oath that for 20 years she had witnessed police officers wearing marks on Ash Wednesday and crosses. The city, by the way, examined her specifically on this questioning at deposition and in their response to summary judgment papers, and here I cite specifically to Appendix A2 at page 370, there is a specific citation by page, line, and cite by Webb's counsel at the time to the following testimony, which, by the way, does not appear, as I'm sure one of you will note, does not appear properly in the record at this point. What's interesting is it appears in Judge Bartle's footnote when he actually discusses the issue, i.e. the issue was raised. The question, of course, is was it properly raised by counsel below? I would have to admit it was not properly handled. It should have been the entire transcript or a larger portion, and that was done incorrectly. But when you look at the fundamental purpose of the rules of civil procedure, as Justice Brennan has noted, it's to serve justice, not to defeat it. And on this one, the fact is the city of Philadelphia, the district court below, everyone understood that these issues were in question, and even if the answer is that it wasn't properly handled, I respectfully submit, when you look at, I'm sorry, Judge Smith. What do you mean properly handled? I believe that the proper way to have handled the issue of the evidence of crosses, palms on palms Sunday, ashes on ash Wednesday, would have been to submit that portion of the transcript in response to the summary judgment motion. But where is there any evidence in the record that these episodes were brought to the attention of the police hierarchy and or that there was any condemnation or permission to people of other religious faiths to exhibit some forms of religious symbolism? I understand the record shows that there were a number of incidents witnessed by the plaintiff and others where this was done by officers, but I was unable to find anything suggestive of a fact that it was brought to the attention of Commissioner Johnson or others below him with some kind of authority to deal with it. Your Honor, I am not sure. There is evidence that it was brought to the level of Commissioner Johnson directly. On the other hand, he worked for the department for a long time. What about supervisors? Was it brought to the level of supervisors? I have to admit, on rebuttal I may address it, I simply don't recall. I know that it did get to Officer Belal, and I believe it may have gotten to Officer Kelly. I'm simply not sure. And what rank is Belal? Belal is a, I don't know. Was there anything in the record about the roll call procedure? Because it seems to me, my limited understanding of the Philadelphia Police Department procedures, every morning at roll call if some officer has an ash on his or her forehead, the supervising officer on the beat at the time with that to her duty has got to see it Your Honor, I apologize. These are the kinds of facts I should know. I was not trial counsel below. But Judge Smith, to address your question fairly, this determination, dismissal of Kim's claim was based upon a cold record, not without the benefit of live witness testimony. I would respectfully submit that each of the questions you raise are very fair and legitimate questions. Would you agree, though, that that would be a requisite of showing that there was some kind of disparate treatment here, that those in authority had knowledge of these episodes and failed to do anything about it, or in fact condoned it? I believe that it could be proven in a number of ways. I'm not an expert in Title VII, but if the answer is The rules of evidence for Title VII are no different from the rules of any evidence Fair enough. The way I would prove it, Judge, if I could show it was so ubiquitous that on every Christmas there was Christmas wreaths, if I could show that there were ashes on Ash Wednesday, palms on Palm Sunday, palms in the cars, people walking around, take some pictures, take some photographs, I would deduce proof that way and demonstrate on remand. Or find other officers who said, you know what, every year they walked in and did this. There was testimony. It was perfect testimony, no. But there was more than a scintilla of proof. There was more than enough that respectfully to the district court below, I do believe that it requires investigation and evaluation at that time. I see that my time has expired, Your Honor. Anything else you want to tell us? Not something to tell you, but I don't want to waste my time. No, no. I wouldn't have asked if we weren't interested in hearing from you. Your Honor, I think that the last issue I'd like to raise is Directive 78 itself. The district court raised that there was uncontradicted testimony. This is A1 at 05. As to the purpose of Directive 78, and Judge Smith, this goes to one of the questions you raised before. The trial court stated, as the following two pages, that religious symbols of clothing would undermine the esprit de corps, the hierarchical nature of the police department, cooperation, and the authority to the public. Perhaps and perhaps not, I respectfully submit that when you put into the balance of scales of justice Kim's liberty right to be heard, to have the opportunity to have these issues really tested, and you throw into it the proofs that we have that other police departments can and have done this, the military does this, whether it's a direct analogy or a weak analogy, it's some proffer of proof. At some point, we have to test the proposition and say, is it the case that the City of Philadelphia really can't handle the kind of civil rights for its police officers that other major cities do? We think the answer is it can. We believe the people of Philadelphia can do this, and that this Court should reverse. At a minimum, we request respectfully a reversal and remand. Thank you, Your Honor. Good. Thank you very much, Mr. Pollack. Any other questions? We'll have you back on rebuttal. Thank you, Judge.  Ms. Ewing. Good morning. Good morning. May it please the Court, Eleanor Ewing representing the City of Philadelphia. I think that Mr. Pollack plainly has a different view of the case than the City. We share Judge Smith's view that really the sole issue in this case is whether Judge Bartle was correct on the issue that the City had proven undue hardship under Title VII. What I kept hearing during Mr. Pollack's argument is a request for a do-over, basically, a wish that the case had been pleaded to include constitutional claims that were never before the district court and that evidence had been developed and introduced in the district court record. Particularly on the evidence point, I heard three, four, five times bald assertions about other departments that none of which evidence had been, and I put quotes around it, had never been before the district court. All of what he is talking about is in the amicus appendix and is a collection of internet articles supposedly saying this, that, and the other thing about different police departments. What about her testimony of what she saw? She testified under oath about what she observed, say on Ash Wednesday, when she saw officers coming with ashes on their forehead. I think she testified about seeing officers wearing symbols of Christianity, the cross or whatever, without being recommended or without being asked to cover it. Am I inaccurate? Does the record reflect your testimony? I tried to, as completely as I could, Judge McKee, to summarize exactly what both judge, well actually to quote what both Officer Webb and Officer Belal said, and it's on page 27 of my brief. And basically both officers said, I'm sure over the, you know, I'm sure during the past number of years, we've seen people with cross pins or angel pins or ashes on Ash Wednesday. And when asked in cross-examination in those depositions, well, can you name one person that we could, you know, we could go and look into, they couldn't name one person. They couldn't name one specific incident. And then the next level of questioning was, well, do you have any evidence, do you have any information that any supervisor ever saw any one of these people wearing a cross pin or an angel pin? No, I don't have that kind of information. There's evidence in the record about the roll call, and I don't know if there is. How could it happen without a supervisor seeing it?  I don't know. There is really no, very little evidence about what went on at the roll call. I don't know whether the police officers are wearing their hats. I don't know whether they're, again, there are no specific incidents, so it's very hard to box the shadows. Well, in the example of Ash Wednesday, isn't it possible that they could go to an Ash Wednesday Mass after roll call? They could have gone after roll call. They could have gone at the end of the day. They could have gone when a supervisor never saw them. And that doesn't even get to the next level of inquiry, which was, well, do you know whether any, if a supervisor saw them, whether they were told they had to wash off the ashes or take off the pin. No, I don't have any information about that. The next question isn't helpful, because either way, there's a problem. If they weren't told to take off the pin and wash off the ashes, that's a problem. Well, if they were told it and didn't do it, then there would be an analogous situation if they were disciplined. If they were told to wash it off and did, then you're right, then that testimony wouldn't prove anything. What I'm really getting to, Judge McKee, is what Judge Bartle found. He had nothing to work with. There was nothing in the record one way or the other about that. Correct. What about the Directive 78? What does that say about wearing religious symbols? What did Commissioner Johnson say about that as well? Commissioner Johnson testified at length about Directive 78, and as one overarching principle, he said, Directive 78 is written so that if it doesn't say it in there, you're not allowed to do it. So that's one thing. But it does say no insignia or emblems of any kind. It uses the term symbols, doesn't it? Well, any kind of symbol. The only thing you're allowed to wear in your uniform are departmental sort of things, if you won an award for valor or something like that. But no Obama buttons, no Irish pride, no religious symbols, no anything symbols, no pictures of your family. What did Commissioner Johnson say about those, if anyone wearing religious items, what are they given? Are the supervisors supposed to tell them about it? Yes. Anyone who is seen deviating from the uniform guidelines in any way are to be told to comply, to remove whatever is the deviation, and if not, they are subject to discipline. Ms. Ewing, if your position is correct with respect to the other claims, that is that the constitutional claims were not raised before the district court, so they're not before us, and that the gender discrimination claim has not been exhausted, we then only have the Title VII religious discrimination claim before us, correct? That would be correct. And is it your position, then, that with respect to that remaining claim, the only task that we have is to determine whether, as a matter of law, Officer Webb's request would work in undue hardship? Correct. That's it, right. Yes. Judge Bartle found that the city had carried its burden based upon Commissioner Johnson's affidavit and deposition testimony of proving an undue burden. In fact, the statute is written in such a way that if there is undue burden, undue hardship, it's not religion. That's correct. That is the way it works. That is the Title VII statute, yes, in the way that it defines religion. And it imposes the obligation on the employer to accommodate the religious request, only to the extent that that request does not impose an undue hardship upon the employer's business. So what kind of evidence should a paramilitary organization be required to come forward with to demonstrate undue hardship? Well, I think that Commissioner Johnson did come forward with the kind of evidence that's required. In the Department of Justice FLRA case, which was border agents wearing union pins, there's a statement that says that when you're dealing with a law enforcement organization, you don't have to wait for some sort of catastrophe so that you can say, look what happened when my force wasn't neutral and, you know, this situation was inflamed or this group of people felt that the government was on their side and it made things difficult. That should be something entrusted or given great deference, at least, to the person in whose responsibility it is for the city's safety or for the group. How do we deal with facts that in other large cities wearing of religious symbols or garb is permitted? Is that irrelevant here? Those are not facts, is my first response to that, Chief Judge. There are no facts in the record that the city of New York permits this. I understand that, but let's assume that it were in the record. Does that make any difference in evaluating whether something is an undue hardship in the view of the city of Philadelphia or its police commission? I think given the proper evidence, I don't think we're taking a position that there can be no scrutiny or no review or just take everything that the commissioner says as, you know. The problem in this case is there was nothing remotely to contradict. Could there be something? I think there could. I think the question is if there were something to contradict, let's assume the record reflected the kind of scenario that Mr. Pollack represented during his argument. With all these cities and small counties, small towns, I assume they are the mission in California and the Midwest, the Southwest, that allow some kind of publicly identifiable religious symbol, such as a Sikh head wrap or a Muslim scarf or head wrap, something like that. If there are towns out there that allow it, that haven't evidenced problems because of it, if that evidence were on the record, I think you're being asked. If not, let me ask you now, how would we then evaluate the commissioner's testimony in this case? Well, you might be getting close to establishing a jury question on that, but I think there would still be an element probably as to whether or not how any of this, if it were properly adduced evidence that in fact some other place had some type of accommodations. Is it similar to Philadelphia? It would all be improper for us to assume that a commissioner of a city the size of Pittsburgh, with his experience, would at least not be aware of the fact that some other large cities, even if he doesn't hold the whole universe of information set forth in the amicus brief, that he is aware that some places in some large cities, they are permitting this. But he simply believes otherwise, that his is the better policy? He could believe otherwise because he may find that there are differences in his city. My question to you is, is it unreasonable for this panel to examine his testimony with that in mind, or is it so dehors the record that it's just too far a step for us to go? I think in this case it's so far from the record that there is nothing to come close to contradicting well set out established reasoning for why he feels this is important to the city of Philadelphia. There would have to be a much, much greater, there would have had to have been a much, much greater offering of evidence both as to what is going on in other cities, and there was absolutely none of that when, for example, I heard an allegation while the city of New York permits turbines, that when I looked it up in the amicus appendix, that had to do with a traffic auxiliary unit. We're not even talking about the NYPD officers in the same situation as the Philadelphia police officers. But now you're doing what you're saying your colleague is doing. It's all hearsay. I don't know. I don't know whether this is, and how could the district court, I mean the district court didn't even have this. This is an amicus brief submitted on appeal. So there just was nothing. There certainly is nothing to challenge the deference in this case. Okay. Your position is that there's nothing in the record here. I'd like you to spend a minute on FOP versus city of Newark. Why does that cut against you in this manner? Well, the FOP versus city of Newark is based upon the fact that there was a secular exemption existing when a religious exemption was requested. And the holding of city of Newark, as I read it, is that where the city would be offering a secular or non-religious exemption to not offer or to refuse a religious exemption is evidence of religious discrimination. And therefore, it takes one out of the lower scrutiny of the Smith case, which I think that that, if we were talking about a constitutional inquiry in this case, I think this would be governed by Smith and it would be rational basis and not a heightened standard. But we have no comparable secular exemption in this case. And I think Mr. Pollack has, in the briefs, he's attempted to raise one with winter scarves, but when you look at the guidelines, the scarf is in the, it's just talking about the colors of scarves and it's talking in the same paragraph as what kind of underwear and what kind of socks you can wear with your uniform. If you also look at the guidelines, it also talks about how you can't have anything on your head under your hat, under any circumstances, so it's clear we're not talking about the same kind. It's nothing about earmuffs that I remember at all. And what it does say, the only references to the head are all with regard to hair and hair ornamentation, hair length. It says you can't wear any type of ornamentation other than a bobby pin. I mean, they specifically knock out just about anything else. And it says that nothing may, your hair even, may not fall below the cap on your forehead below the cap, the military cap. And so, clearly if you were going to wear a scarf, even for warmth, it would, in a way that was comparable or parallel to what he's arguing, or with respect to the Kimar, it would be in violation of the guidelines because it would be coming down over the forehead, just like prohibited hair down over the forehead. So, anything else you want to tell us? I think what I would close with is just, I realize, and I think the city is sensitive that there are different views towards religious diversity. That's exemplified in many departments of the city. What we are talking about is something that's unique to paramilitary organizations, specifically unique to the police department. And whether my opinion or Mr. Pollack's opinion, when I heard him say, I think Philly can tolerate this. It's not for Mr. Pollack, it's not for me. It's for the decision makers accorded due deference to make the decision as to whether or not the armed agents of the government in this city requires a strict religious and every other kind of expressive neutrality. One last thing. Mr. Pollack suggested that times have changed and that the Supreme Court and perhaps other appellate courts may view these matters differently from how they looked at them 30 years ago. And that particularly with respect to religious freedom, courts might be more willing, however the Supreme Court, which is the court that counts in this case, might be more willing to grant less deference to police authorities in these kinds of matters. Do you discern a similar trend as well? I don't, and I would point to two cases I guess on the Supreme Court level. We have Smith, which actually with respect to neutral regulations of general application, reduced the level of scrutiny. And with respect to this very Title VII issue, we have the Daniels case that's cited repeatedly in our brief. That's April of 2001 in the Fifth Circuit and involved very, very similar situation. In this instance, an evangelical Christian who felt that his religion compelled him to display the cross on his uniform. And the court found as upheld as a matter of law that the city had established undue hardship under Title VII under very similar rationale. Thank you. Your Honor, if I may address first the last question you asked, which is Supreme Court precedent. In response to the same question, if you don't mind, I'd recommend that we consider also Lukumi Babalu, which also is along the same line. I'd like to start, I'll be very brief, Your Honor, as you've been patient with us. Rule 56 sets forth a standard which states that in a summary judgment motion under 56C, all inferences are to be drawn in favor of the non-moving party. I would respectfully point out that if you were to look at Appendix 370, Paragraph 18, what it says directly is, Officer Balal, while at work for the City of Philadelphia, has witnessed police officers wearing lapel pins that have crosses and necklaces with crosses on them, and then gives a direct citation to the deposition transcript. Also has witnessed ashes on their foreheads, ashes on Wednesday's religious symbols. Religious symbols mentioned were visible on the front of the respective officers. Notwithstanding, Officer Webb has been the only officer penalized for wearing prohibited religious symbols. If there were one thing more there that would raise an issue of fact about whether or not a supervisor saw that. I think, Judge McKee, unfortunately, it's the same question that Judge Smith asked before. I don't believe that that evidence is in the record as it currently stands, but I would note in fairness that this matter was dismissed on summary judgment, on the papers. If that is such a critical question, and it may well be, then the proper thing to do is to give Webb the opportunity to establish on remand that in fact her supervisors did know about it or ignored it. Yeah, but Ms. Bonacona said, well, wait a minute, she was on the witness stand once. The plaintiff already had an opportunity to establish that. So it's almost as though you run it by the district court, you get our opinion, letting you know what the witnesses have to, where they have to spackle in the cracks. Then it goes back down and they come in with their putty knife and they are able to spackle the cracks. I'm not suggesting perjury or anything of that sort, but all I'm suggesting is everything that you may gather from the question, accurately or not, concerns anyone up here. Could easily have been addressed when Ms. Webb testified in the district court or when Officer Bonalla testified. It could have, and perhaps it should have. There was no live witness testimony. This was decided solely on the papers, Judge. Two last points, Your Honor, and I know my light has expired, if I may briefly. One, with regard to the scarf, I will note the exact testimony of Police Chief Johnson, which was a question of, is it like you asked about, Your Honor, regarding the City of Newark case. What Commissioner Johnson stated, appendix A2, page 149, lines 22 to 23, that a Kimar is, quote, similar to a scarf over a lady's head and around her neck. He didn't draw a significant distinction. If a scarf is allowed under the police department regulations to be worn for secular purposes, warmth or for any other reason, and by the way, it doesn't say anything about temperature. It simply says you can wear a scarf. And Kim intends to wear a scarf exactly in the color permitted by the Philadelphia regulations. If it's permitted for a secular purpose, it must be permitted for a religious purpose. But if, and assuming we're looking only at Title VII here and not the First Amendment, if wearing the scarf, if the scarf is worn under circumstances where it clearly conveys a message other than religious neutrality to the person that sees that scarf, then you've got a different situation than if someone is wearing a scarf and it's 10 degrees below zero outside. Judge McKee, I guess my response to that is she intends to wear it around her head and neck. I'm not sure where else you'd wear a scarf. Well, no, but she intends to wear it when it's 90 degrees as well as when it's minus 10 degrees. That's why I'm saying if religious neutrality and the message that is conveyed about religious neutrality is important in terms of the reasonable accommodation here, a scarf, not all scarves are scarves. Some scarves take on much more significance than scarves. A scarf is the same as if I take two toothpicks and have one perpendicularly and one horizontally creating four right angles. People will realize that is a cross. That's not just a toothpick. Your Honor, I understand, but I do think that the only point I would make is that while I concede that, yes, wearing a scarf over your head in the middle of summer is clearly not a winter scarf, when you put into the balance the fundamental liberty right that is at issue here, the question then is, is a little bit showing over the forehead and a little bit behind her ears and on the back of her neck, is that such a violent religious symbol that we cannot tolerate that, or is, in fact, that's a de minimis religious symbol, like, for example, others that have been tolerated, apparently without harm? And if that hasn't done, I would respectfully submit it's something we should investigate on remand. There are two last points I wanted to make. One is that when Kim Webb made her request, specifically in writing for religious accommodation, and, by the way, quoted the First Amendment, when she made that request... You said the term she used, religious accommodation? Yes, she said on page 893 of the appendix, volume 2, the subject is religion. She didn't use... No, I wasn't focusing on religion. I was focusing on the accommodation term, which in any employment context is going to signal Title VII, not First Amendment. I apologize, Judge, for cutting you off. She did state in her request to her supervisor at that time that she wanted an accommodation. She cites religion. When you look at the paragraphs and you look at it for yourself, page 893 of the appendix, she clearly says that. She quotes the First Amendment directly. She says, that's what I'm relying on. One last thought, Your Honors, and I appreciate, again, your patience here today. I beg you, when you go back and deliberate, consider one thought, which is that if you grant an affirmance today, you are setting the policy and precedent for this jurisdiction for decades to come. Well, it depends on how it's written. If, and I'm not... We haven't accomplished this case. If the opinion is written in such a way as to suggest the dearth of evidence of anything on the record to suggest anything other than the kind of situation that we got into, the Supreme Court got into in Harbeson, that then the city has maintained its burden under Title VII of showing that there's an undue burden here. If it goes beyond that and the First Amendment's involved, it may get more difficult. But it depends on what is before us and the way we respond to what's before us. I'm not so afraid of horribles that you're trying to march by us. I'm not sure that's as long a parade as you're suggesting it is. Well, I hope you're right, Judge. My concern would be this, is that if there's a Jew who wants to wear a yarmulke, a Sikh who wants to wear a turban, a Muslim who wants to wear a hijab, other cities within the Third Circuit are going to look to this decision. And therefore, I would beg you to have that decision made on a properly developed record. I believe this record has got failures, many of which are not Judge Bartle's failure, and I note that, some of which I believe were incorrect as a matter of law and fact. But I would simply beseech this Court to not rush into a decision, because we've lived for 32 years with Kelly v. Johnson, and I think it's time we moved on. Good. Thank you very much, Mr. Pollack. We thank both counsel for a very helpful argument. We'll take the case under advisement.